UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| JOVAN CLAYBRON, | |
| Plaintiff, | Case No. 23-10840 |
| | Honorable Brandy R. McMillion |
| v. | Magistrate Judge Elizabeth A. Stafford |
| JODI DEANGELO, *et al.*, | |
| Defendants. | |

**REPORT AND RECOMMENDATION TO GRANT
DEFENDANTS' MOTION TO DISMISS
(ECF NO. 36)**

## I.    Introduction

Plaintiff Jovan Claybron, a prisoner proceeding pro se and under 42 U.S.C. § 1983, sues Jodi DeAngelo, the Warden of the Woodland Center Correctional Facility (WCC); Heidi Washington, the director of the Michigan Department of Corrections (MDOC); and Michigan Governor Gretchen Whitmer.  ECF No. 1.  Claybron says that he has Wegener's disease, "a rare incurable vasculitis disease, which caused [his] renal failure."  *Id.*, PageID.2.  Since 2015, he has had 90 hospitalizations and 48 surgeries.  *Id.*, PageID.6.

Claybron and other inmates of the MDOC who required dialysis were housed at the Ryan Correctional Facility (DRC) until it closed in early 2021. *Id.*, PageID.2.  The MDOC then transferred them to WCC, where allegedly they must drink contaminated well water that threatens their health.  *Id.*, PageID.2-3.

Claybron alleges that each defendant approved the closure of DRC and his transfer to WCC; they "knowingly transferr[ed] him from a facility with drinkable water to a facility with contaminated water."  *Id.*, PageID.5. He claims that the transfer thus violated his rights under the Eighth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  *Id.*

Defendants move to dismiss Claybron's complaint, asserting that he fails to state a plausible claim for relief.  The Court agrees and recommends that defendants' motion be granted.

## II.    Analysis

### A.

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests a complaint's legal sufficiency.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S.

2

662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The *Iqbal* Court explained, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  The complaint's allegations "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief."  *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original).

In deciding whether a plaintiff has set forth a "plausible" claim, the Court must construe the complaint in the light most favorable to the plaintiff and accept as true all well-pleaded factual allegations.  *Id.*  But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678, and the Court has no duty to create a claim not spelled out in the pleadings. *Freightliner of Knoxville, Inc. v. DaimlerChrysler Vans, LLC*, 484 F.3d 865, 871 n.4 (6th Cir. 2007).

Pleadings filed by pro se litigants are entitled to a more liberal reading than would be afforded to formal pleadings drafted by lawyers, but such complaints still must plead a plausible claim for relief.  *Davis v. Prison Health Services*, 679 F.3d 433, 437-38 (6th Cir. 2012).

3

**B.**

The Court will begin by picking off the low hanging fruit.

Claybron sues defendants in their individual and official capacities. ECF No. 1, PageID.1.  Citing sovereign immunity, defendants move to dismiss the claims against them in their official capacity.  ECF No. 36, PageID.205-206.  Claybron's response confuses sovereign immunity with qualified immunity.  ECF No. 39, PageID.244-245.  And his suit against defendants in their official capacity cannot withstand defendants' sovereign immunity defense.

The Eleventh Amendment protects states, their departments, and agencies from suit in federal court for injunctive relief or damages by their own citizens or citizens of another state.  *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Mich. Interlock, LLC v. Alcohol Detection Sys., LLC*, 360 F. Supp. 3d 671, 676 (E.D. Mich. 2018), *aff'd*, 802 F. App'x 993 (6th Cir. 2020).  Without clear abrogation of a state's immunity under a valid exercise of power, it may not be sued without its consent.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-99 (1984).  Michigan has not consented to civil rights suits in federal court.  *Johnson v. Dellatifa*, 357 F.3d 539, 545 (6th Cir. 2004).  Eleventh Amendment immunity extends

4

to state employees being sued in their official capacities.  *See Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010).  Thus, the official capacity claims against defendants should be dismissed.

Defendants also move to dismiss Claybron's claims under the Fourteenth Amendment, stating that the claims here should be analyzed under the Eighth Amendment.  ECF No. 36, PageID.206-207.  In response, Claybron notes in conclusory form that the right to due process is clearly established, but he fails to explain the basis for a due process claim under the facts here.  ECF No. 39, PageID.245-246.  The Court finds that Claybron states no due process claim.

Substantive due process prohibits the government from deprivations of life, liberty, or property that "shock the conscience."  *Kerchen v. Univ. of Michigan*, 100 F.4th 751, 763 (6th Cir. 2024).  The "high bar" for showing substantive due process requires an intent "to injure in some way unjustifiable by any government interest."  *Id.* at 764 (cleaned up).  Claybron alleges no intent to injure.  Instead, he asserts that defendants have been deliberately indifferent.  ECF No. 1, PageID.6; ECF No. 39, PageID.245-246.  Claybron also states no procedural due process.  "The elements of a procedural due process claim are: (1) a life, liberty, or property interest requiring protection under the Due Process Clause, and

5

(2) a deprivation of that interest (3) without adequate process." *Fields v. Henry Cnty., Tenn.*, 701 F.3d 180, 185 (6th Cir. 2012). Claybron asserts no protected interest. He complains that defendants closed DRC and transferred him to WCC. But as defendants note, the Due Process Clause does not "guarantee that the convicted prisoner will be placed in any particular prison." *Meachum v. Fano*, 427 U.S. 215, 224 (1976); *see also Ortega v. U.S. Immigr. & Customs Enf't*, 737 F.3d 435, 439 (6th Cir. 2013).

Though Claybron cited the Equal Protection Clause in this complaint, ECF No. 1, PageID.5, defendants did not address that clause in their motion to dismiss. But under 28 U.S.C. § 1915A(b), the Court must address sua sponte whether Claybron's states an equal protection claim. "The Equal Protection Clause prevents states from making distinctions that (1) burden a fundamental right; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without any rational basis." *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010). Claybron makes no claim that defendants burdened a fundamental right; no claim that he is a member of a suspect classification; and no claim that he was treated differently than similarly situated prisoners without a rational basis. So he states no plausible claim under the Equal Protection Clause.

6

In sum, Claybron's claims against defendants in their official capacities and under the Fourteenth Amendment should be dismissed.

## C.

Whether Claybron states a plausible Eighth Amendment claim is a closer question.  But after considering all relevant information, the Court finds that the Eighth Amendment claim should also be dismissed.

What is the relevant information here?  "Generally, at the motion-to-dismiss stage, a federal court may consider only the plaintiff's complaint." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014).  But "documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss."  *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)).  And "if public records refute a plaintiff's claim, a defendant may attach those documents to its motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion without converting the motion to dismiss into a Rule 56 motion for summary judgment." *Watermark Senior Living Ret. Communities, Inc. v. Morrison Mgmt. Specialists, Inc.*, 905 F.3d 421, 425 (6th Cir. 2018).  "Such public records that a court may consider include documents from other court proceedings."  *Id.* at 425-26.

7

The relevant information here is Claybron's complaint, the attachments to his complaints, and public records from another case that defendants cite.

The next question is what is needed to state a plausible Eighth Amendment claim based on the conditions of confinement.  The Amendment protects against the infliction of "cruel and unusual punishments" that involve "the unnecessary and wanton infliction of pain." U.S. Const. amend. VIII; *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (cleaned up).  So prison officials must "provide humane conditions of confinement" and "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (cleaned up).

To state an Eighth Amendment claim, a plaintiff must allege facts that plausibly meet objective and subjective components.  *Id.* at 834.  The objective component requires that the deprivation pose a "sufficiently serious" risk of harm, and the subjective component requires that the involved prison official had a "sufficiently culpable state of mind."  *Id.* (cleaned up).  Prison officials may "not ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering."

8

*Helling v. McKinney*, 509 U.S. 25, 33 (1993).  So, for example, "a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery."  *Id.*

In *Helling*, the plaintiff complained of exposure to unreasonably high levels of environmental tobacco smoke (ETS).  To meet the objective standard, he had to "show that he himself [was] being exposed to unreasonably high levels of ETS," which would entail "a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS."  *Id.* at 35-36.  The plaintiff also had to show that the risk of harm was "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk."  *Id.* at 36.

Claybron details in his complaint and his affidavit the reasons why he believes the drinking water at WCC is contaminated and poses a danger to his health:

- He alleges that his family researched and learned that WCC used well water that was contaminated with lead, arsenic, and E. coli.  ECF No. 1, PageID.2.  To support this allegation, Claybron attaches an undated document identifying water systems with "M&R" violations and showing that WCC's

9

violations were for "Coliform/E. Coli" and Chlorine.  *Id.* at PageID.15.

- Claybron claims that "[d]rinking the water has caused plaintiff to have bouts of dizziness, diarrhea, weight loss, headaches, vomiting, involuntary bowel movements, and urinary infections." *Id.* at PageID.3, 22.  This allegation is supported with an exhibit showing that, in March 2023, Claybron had blood in his urine three times within three months.  *Id.*, PageID.16.

- Claybron alleges that he had been hospitalized five times since his transfer to WCC, three times because of urinary tract infections.  *Id.* at PageID.3.

- He claims that Warden DeAngelo ordered her staff to not drink WCC water or use it for coffee.  *Id.*, PageID.4, 22.

- Claybron alleges that 12 dialysis patients have died and that every dialysis patient has been hospitalized since the dialysis unit moved to WCC.  *Id.*, PageID.4, 22.

Claybron attaches affidavits to his complaint from other inmates in the dialysis unit whose allegations mirror his claims:

- Phelene Lunn states that DeAngelo tells her staff not to drink WCC water; that he has suffered fatigue, diarrhea, and

dizziness since his transfer to WCC; and that the water is often brown and foul smelling.  *Id.*, PageID.17.

- Leon Taylor-Bey alleges that the water at WCC is contaminated with E. coli, lead, and other harmful contaminants; that he has lost 35 pounds and has sometimes experienced headaches, diarrhea, vomiting, and involuntary bowel movements; that the well water is yellowish brown and has turned the stainless-steel showers brown; that DeAngelo orders her staff not to drink or use the water for coffee; and that 12 dialysis patients have died. *Id.*, PageID.18.

- Michael Fletcher says that he has been hospitalized five times since he was transferred to WCC in January 2021; that the water is brown and has caused him to vomit and to have rashes and diarrhea; that DeAngelo gives her staff bottled water; that the water has turned the sinks, toilets, and showers brown; and that he takes 12 medications daily, has lost weight, and is always tired.  *Id.*, PageID.19.

- Darren Stribling claims that the water at WCC is "discolored, foul tasting, and purported to be contaminated with high levels of sodium, calcium, rust and arsenic"; that he has visited "health

11

care several times for nausea, diarrhea, and stomach cramping as a result of drinking the water"; that he has bodily rashes and fungus from showering; and that the well-water system has broken down causing him to miss or have shortened dialysis sessions.  *Id.*, PageID.20.

- C. Pepper Moore says that he must take his medicine with "arsenic laced" and "brown waste smelling water"; that the water dries out his skin and causes him rashes; that DeAngelo ordered her staff not to drink the water; that the water causes him to involuntarily vomit; that the brand-new sinks, toilets, and showers turned brown from the water; and that 12 dialysis patients died in the two years after the dialysis unit was transferred WCC.  *Id.*, PageID.21.

At first glance, Claybron's complaint and the supporting affidavits suggest that he may have a plausible claim that defendants have been deliberately indifferent to the danger that the inmates in the dialysis unit are drinking contaminated water that threatens their health.  But defendants cite evidence in the court record from affiant Stribling's own lawsuit against Washington and DeAngelo that refutes Claybron's claim that the water at WCC is contaminated.  ECF No. 36, PageID.202 (citing *Stribling v.*

12

*Washington, et al.*, Case No. 20-cv-12990).  The Court may consider the records from *Stribling* that refute Claybron's claims when deciding defendants' motion to dismiss.  *Watermark Senior Living Ret. Communities,* 905 F.3d at 425.  As an exhibit to their motion for summary judgment, the *Stribling* defendants filed laboratory testing of the drinking water conducted by the Michigan Department of Environment, Great Lakes, and Energy (EGLE) in November 2022.  Those test results stated that no Coliform, E. coli, arsenic, or lead were detected in WCC's drinking water. Case No. 20-cv-12990, ECF No. 100-7, PageID.1048-1050.

　　　And many allegations in Claybron's complaint and supporting affidavits are speculative.  *See Taylor v. Bedford Cnty. Sheriff's Dep't*, No. 1:16-CV-081-HSM-CHS, 2018 WL 6004663, at *2 (E.D. Tenn. Nov. 15, 2018) ("Plaintiff's allegations regarding his conditions of confinement do not raise Plaintiff's right to relief above a speculative level and therefore fail to state a claim.").  Claybron and the other affiants can only speculate that the drinking water causes their symptoms or caused other inmates to die.  "'It is axiomatic in logic and in science that correlation is not causation. This adage counsels that it is error to infer that A causes B from the mere fact that A and B occur together.'"  *Bloomfield Hills Country Club v. Travelers Prop. Cas. Co. of Am.*, No. 15-11290, 2016 WL 5899084, at *5 (E.D. Mich.

13

Oct. 11, 2016) (quoting *Craig ex rel. Craig v. Oakwood Hospital*, 684 N.W.2d 296 (Mich. 2004)).

Claybron's claim that the WCC drinking water caused him to be hospitalized five times is especially speculative.  He alleges in his complaint that he was hospitalized 90 times since he was diagnosed with Wegener's disease in 2015.  ECF No. 1, PageID.6.  If Claybron was hospitalized only five times since his 2021 transfer to WCC, that means that he was hospitalized *85 times* in the six years *before* he was forced to drink WCC's water.  And Claybron makes no allegation that medical providers concluded that his symptoms or hospitalizations were caused by contaminated water.  In fact, he refused to sign an authorization to allow the MDOC to obtain copies of his medical record.  *See* ECF No. 36-2, PageID.224-226.  "Plaintiff's speculative and conclusory allegations about contaminated water and any resulting injuries fail to state a claim."  *Wilson v. Mancuso*, No. 2:23-CV-01080, 2023 WL 9423305, at *3 (W.D. La. Dec. 28, 2023), *adopted*, 2024 WL 314995 (W.D. La. Jan. 26, 2024).

The well water at WCC may be discolored, foul-smelling, and foul-tasting, but the Eighth Amendment prohibits only "extreme deprivations" that deny prisoners "the minimal civilized measure of life's necessities." *Hudson v. McMillan*, 503 U.S. 1, 8-9 (1992) (cleaned up); *see also Taylor*,

14

2018 WL 6004663 at *2 (rejecting claim of unconstitutional conditions of confinement because "[n]othing in the complaint suggests that the rust, mold, fungi, dust, and other 'unidentified bacteria' at the jail, Plaintiff sleeping on the floor, or the leaking toilet creates an unreasonable risk of damage to Plaintiff's health.").

Claybron does not plausibly allege that the drinking water at WCC poses a sufficiently serious risk of harm, so he fails to state a claim under the Eighth Amendment.

### III.   Conclusion

The Court **RECOMMENDS** that defendants' motion to dismiss (ECF No. 36) be **GRANTED**.

s/Elizabeth A. Stafford
Elizabeth A. Stafford

Dated: July 29, 2024                          United States Magistrate Judge


### NOTICE TO THE PARTIES ABOUT OBJECTIONS

Within 14 days of being served with this report and recommendation, any party may serve and file specific written objections to this Court's findings and recommendations.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  If a party fails to timely file specific objections, any further appeal is waived.  *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*.*  And

only the specific objections to this report and recommendation are preserved for appeal; all other objections are waived.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this report and recommendation to which it pertains.  Within 14 days after service of objections, **any non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.  If the Court determines that any objections lack merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that this document was served on counsel of record and any unrepresented parties via the Court's ECF System to their email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 29, 2024.

s/Donald Peruski
DONALD PERUSKI
Case Manager